## EX PARTE FELDER, IN RE FELDER v. VOSE.

RULE OF CONSTRUCTION OF WRITTEN INSTRUMENTS stated. The written agreement here in question construed to be not an assignment of a balance on a foreclosure judgment, but an agreement by mortgagee to pro rate with heirs of mortgagor amount of foreclosure sale over a sum certain on scale of dividends paid to mortgagor's unsecured creditors. MR. JUSTICE GARY *dissents as to construction of this instrument.*

Before BUCHANAN, J., Orangeburg, October, 1900. Reversed.

Agreed case without action by J. S. Felder, E. M. Vose and Alma Felder, *in re* Caroline Felder and Jacob S. Felder, as executors of Paul S. Felder, deceased, and in their own right, against Elizabeth M. Vose *et al.,* and The Bank of

Charleston, N. B. A., for construction of written agreement. The following is the Circuit decree:

"In the settlement of the indebtedness and estate of Paul S. Felder, a dispute has arisen as to the application of a certain tract of land to the payment of the claims of his indebtedness. It was claimed, and seemingly with good reason, that the Salley tract was the property of the heirs of Paul S. Felder by his first wife; that his first wife had a life estate only, and that after her death the property rightly and properly belonged to her children. The words, heirs of Paul S. Felder, were used to indicate the children by his first wife, being the only children of Paul S. Felder, and the only children of the first wife; for while he was married twice, there are no children by the second marriage. The land referred to, it is claimed, came from the mother of the children who now claim it; and it was contended, was in no sense responsible for the debts of Paul S. Felder. The creditors were desirous of obtaining payment from everything rightly belonging to the estate of Paul S. Felder; and inasmuch as Paul S. Felder had mortgaged the land, or had given a deed purporting to convey by way of mortgage the said Salley or Martin place to the Bank of Charleston, National Banking Association, as security for certain indebtedness, the association desired the application of the proceeds to the payment of its claims, or to the extent of the amount that would come from its sale. The said Paul S. Felder, by his last will and testament, devised the tract of land to his four children, who are parties hereto. The executors filed a creditor's bill to marshal the assets of his estate, the same being insolvent; the said association being a creditor and a party to the action, proved its debts for a considerable sum, and the heirs at law of Ann M. Felder, deceased, filed their answer, claiming that the said Salley or Martin place was not a part of the real estate of Paul S. Felder, deceased, but was conveyed to their mother, Ann M. Felder, the first wife of the said Paul S. Felder, for life, and after her death to her children, and that the mortgage executed to the said banking association

by the said Paul S. Felder in his lifetime, was to secure a
past due indebtedness of the said Paul S. Felder, deceased,
and that their rights in said premises were not affected
thereby. Several references had been held on this issue,
and after an appeal had been taken by the association to the
Supreme Court as to the right of trial by jury of this issue,
and while said appeal was pending in the Supreme Court,
an overture was made by said association to the children of
Ann M. Felder heretofore mentioned (Jacob Felder, Eliza-
beth Vose, Annie A. Izlar and Alma Felder) looking to the
settlement of the issue between the association and such
heirs (of Ann M. Felder)—an agreement was perfected
and the construction of that agreement, is the object of
the 'controversy without action.' In the beginning it shall
be remembered that the association claimed as against the
heirs (of Ann M. Felder) the land or its proceeds; whereas,
the heirs claimed the land and all of it under their mother,
who, it was contended, had only a life estate, and that the
remainder belonged to them; and that, inasmuch as the life
tenant was dead, they were entitled to the immediate posses-
sion of their land; that they did not claim through their
father, who, while he mortgaged (or attempted to convey
by mortgage) the said land, yet he disposed of it by will, as
he doubtless thought the land would or should go, it having
come from or by his first wife.

"It was urged that it was the purpose of Paul S. Felder
to mortgage only what he must have known he possessed,
and in disposing of the place to the heirs of the first wife,
he but carried out what he believed the law would carry out
in any case, *i. e.*, give the land over to the children of Ann
M. Felder. The heirs of Ann M. Felder, as incidental to
the ownership of the lands, claimed the fruits of such owner-
ship, the right of its production, &c. The association in-
sisted on its rights under the mortgage, and being met with
this claim of the heirs that bid fair, if established, to defeat
its security entirely, was willing to agree to some arrange-
ment. The heirs, doubtless, with a view of helping along

the payment of the indebtedness of their father and to the amount of $8,000, agreed to the proposition—the heirs concede in the light of their claim, the association contends in the light of its mortgage. The heirs of Ann M. Felder, claiming the whole land in fee, agree with knowledge of its entire claim; the association, knowing the amount of indebtedness claimed by it, desires payment out of the proceeds of the land.

"Some concession was desired on the part of each, which each was willing to give. The contract was signed. What are the rights of the heirs of Ann M. Felder under it? This involves an inquiry into what was designed by each party when the agreement was signed; what were the contentions, and, in the light of the positions of each party, what was meant in the use of the terms employed? In construing a contract, the leading course of construction is to ascertain the intention of the contracting parties, and whatever that intention was, to carry it out. The intention, if possible, shall be gathered from the contract itself. *Anderson* v. *Holmes,* 14 S. C., 165; *Lockwood* v. *Young,* 33 S. C., 550. If, however, the terms of the contract were not clear, but the language used is susceptible of more than one construction, thus rendering the contract ambiguous in its terms, then the Court may resort to extrinsic evidence to aid it in arriving at the true intention of the parties, and as to the circumstances which led up to the making of the contract, the conditions which existed between them at the time of exacting it, the object to be attained, &c. *Maxwell* v. *Thomas,* 15 S. C., 612. It was expressly agreed here, 'that either party may refer to the record in the main case as often as may be necessary in arguing this controversy.' The light drawn from such 'main case' was given the Court by argument of learned counsel, who argued the matter on each side respectively. The history of the case has materially aided the Court in finding the intention of the contracting parties, and what was meant by the language employed in the writing. It may be stated that each party gave up by

agreement only so much of his claim or contention as was specifically given up, or was incidental or necessary to the specific concession contemplated. I think the heirs of Ann M. Felder intended a yielding up or concession of the land, which would amount to the sum of $8,000. This seems to have been the limit, and the amount above that sum the Felder heirs were to receive. The valuation was fixed at $8,000 by the bank itself, with which the bank was doubtless satisfied. It desired to realize that much out of the sale of the place. It was not satisfied that the land would bring that much, but both parties did know that the amount secured by the mortgage exceeded $8,000, and that if the heirs withdrew their fight as to the title to the land that the bank would be entitled to judgment for a much larger sum. If the heirs were to give up all claim to the excess over $8,000, what would be the need of any agreement? A new disclaimer or a withdrawal of the answer would permit the bank to get what it wanted. This would be no compromise, so far as the heirs were concerned. It would be a surrender of their claim and rights as the owners of the fee in the Salley place. So a different agreement was made—not an abject surrender of the land claimed to be derived from their mother, but a compromise—a mutual waiver of a part of each contention. It was agreed that the answer was to be withdrawn, and judgment and foreclosure was to be had— the value of the land was to be fixed so that the bank would realize the sum of $8,000, which it wanted out of the judgment.

"The referee reported the indebtedness to the bank to be $10,561.93, with interest from September 20th, 1898. By this arrangement the bank would get out of a very doubtful lawsuit, and would realize about eighty per cent. on its claim. This was the realization promised itself by the bank. So the heirs agreed to withdraw their answer and allow judgment of foreclosure and sale, and the bank agreed to give them in consideration the benefit of all the judgment so to be obtained, in excess of the $8,000. True, the con-

tract speaks of sharing in the *pro rata* dividends which the other creditors would get out of the other assets of Paul S. Felder's estate, but that part of the contract, I think, was intended to meet the contingency of the Martin or Salley place selling for less than $8,000, in which case the bank was to get the dividend on such part of the judgment as might be between what the place sold for and $8,000, and the Felder heirs on the amount over $8,000. Suppose the judgment entered up had been $10,500, and the land had sold for $7,000. There would have remained unpaid on the judgment $3,500, and the bank would have been entitled to the fruits of $1,000 of this, representing the amount between the bid and the amount fixed in the agreement, and the Felder heirs would have been entitled to the fruits of $2,500, being the amount over the sum in the agreement. It, however, turned out that the land sold for $9,000, that is $1,000 over and above the sum fixed in the agreement, as the amount of the judgment reserved to the bank, and I think that, under the agreement, this $1,000 belongs to the Felder heirs and not to the bank. I think that the agreement, though not in terms as apt as might be, operated as a transfer or assignment of all of the interest of the bank in the judgment it obtained on the mortgage on the Martin place over and above $8,000 to the Felder heirs, and that the fruits of the parts transferred, whether derived from dividends from the other assets of the estate of Paul S. Felder or from a sale of the land securing the judgment, matters not. The controversy here concerns immediately only the bank and the heirs of Ann M. Felder. The intention of the parties was, I think, that the bank should have the benefit of $8,000 of the judgment obtained on the foreclosure of the mortgage, and the Felder heirs to have the benefit of all the judgment over and above this amount. But there is another view of the matter that might work a recognition or ·may be construed as making an admission of the $1,000 as due to the Felder heirs, growing out of the payment of the dividend on the basis herein indicated. $9,000, it seems, was de-

ducted from the judgment, and dividend only paid on the balance, if I have correctly understood the facts and argument. The agreement is not apt in its terms, and in argument a good deal of light was drawn by learned counsel from the main case and from the general history of the litigation, and in the light of this information as explaining the language used in the agreement, I think the Felder heirs entitled to the overplus of $1,000. The Felder heirs were to practically abandon their claim and withdraw their contest over this particular piece or tract of land, and the bank was to give them the benefit of all the judgment recovered in the foreclosure of the mortgage over and above $8,000, and when the land brought $9,000, the $1,000 should go to the Felder heirs.

"The language of the agreement, construed with reference to the purposes and interests, position and history, developed on the argument, I think meant the plan here found. No one could foretell the property would bring more than $8,000. It might bring more; it did bring $9,000. That it did, is the misfortune of the bank. It received its $8,000 with the $1,000 above it. It was the good fortune of the Felder heirs that it did bring $1,000 over and above $8,000. They withdrew their answer, and I think they are fairly entitled to the $1,000. And now, pursuant to the terms of the agreement, judgment is hereby rendered against the said Bank of Charleston, National Banking Association, for the sum of $1,000, with interest from the 6th day of November, 1899, being the whole amount claimed by the heirs of Ann M. Felder, deceased, in favor of said heirs, Jacob S. Felder, Elizabeth M. Vose, Annie A. Izlar and Alma Felder, in settlement of the controversy without action, argument upon which was had before me."

From this decree the Bank of Charleston, National Banking Association, appeals.

*Mr. S. G. Mayfield,* for appellant, cites: *Judge must con-*
   34—61

*strue written instrument:* 40 S. C., 134; 39 S. C., 290, 379. *Parol evidence is inadmissible to vary or alter a written contract:* 42 S. C., 66; 39 S. C., 290; 5 Pet., 394; 38 S. C., 417.

*Mr. Laurie T. Izlar,* for Felder heirs, contra, cites: *Contract must be so construed as to carry out intention of the parties:* 14 S. C., 165; Add. on Con., 845; 23 S. C., 235. *And if unambiguous, the intention must be gathered from instrument itself:* 14 S. C., 165; 3 Story, 122; 26 S. C., 97. *But if ambiguous, resort may be had to extraneous evidence:* 16 S. C., 357; 40 S. C., 131; Green. on Ev., sec. 282; 41 S. C., 153; 15 S. C., 612; 79 Ala., 516; 31 S. C., 59. *Acts of parties under, will be given the effect of construing the contract:* 7 W. R., 51; 26 S. C., 304.

September 17, 1901. The opinion of the Court was delivered by

MR. JUSTICE JONES. This is a "controversy without action" based upon an agreed statement of facts, and involved merely the construction of a written agreement between the Bank of Charleston, N. B. A., and the respondents, heirs at law of Paul S. Felder, deceased, with reference to the sale of certain lands mortgaged by Paul S. Felder to the Bank of Charleston, N. B. A., and the disposition of the proceeds of the sale and the balance of the mortgage debt. In a suit by the bank to foreclose the mortgage, the heirs of Felder made contest that the mortgaged premises did not belong to the estate of Paul S. Felder, but to them as remaindermen after the falling in of the life estate of their mother, Ann M. Felder. This controversy was compromised by the agreement in question, which is as follows:

"Proposition of Bank of Charleston, National Banking Association.

"The Bank of Charleston, National Banking Association, makes the following proposition to the heirs at law of Ann M. Felder for the settlement of the above entitled case:

"1st. Let bank withdraw its appeal and take judgment in foreclosure at this term of Court and order of sale for sales-day in November.

"2d. That heirs at law consent for judgment of fore-closure in favor of the Bank of Charleston, National Banking Association, and the order of sale.

"3d. That after the sale of the Martin or Salley place at foreclosure sale, then the difference between $8,000 and the mortgage debt is to be turned into the general fund and the *pro rata* part of the balance of the judgment in foreclosure is to be turned over to the said heirs at law of Ann M. Felder; that the heirs at law are to get the *pro rata* portion which the Bank of Charleston, National Banking Association, would have received on the balance of the judgment in fore-closure in excess of the valuation fixed therein ($8,000); that if the Martin or Salley place sells for more or less than the sum of $8,000, the intent of this proposition is that the heirs at law of Mrs. Ann. M. Felder are to have the benefit of the *pro rata* dividend which the estate of Col. Paul S. Felder pays on the dollar to the unsecured creditors on the difference between $8,000 and the full mortgage debt due this bank just as if said place sold for $8,000.

"4th. That the heirs at law shall have the rent and profits of the Martin or Salley place up to and including the year of 1899.

"5th. That no part of the judgment of the Bank of Charleston, National Banking Association, obtained in this and other cases on notes other than that secured by the mortgage of the Martin or Salley place, is to be turned over to the heirs at law of Ann M. Felder."

This proposition was accepted and the agreement signed by the parties. The land was sold in November, 1899, and the bank became the purchaser for $9,000, which was paid over to the bank or its attorney on its mortgage debt, leaving a balance on said debt at the time of the distribution among the creditors of said estate, amounting to $2,618.54. Thereafter, on the 21st December, 1899, the Felder heirs

received from the bank, "on account under the agreement," $344.33, being 13 1-15 per cent. on $2,618.54, the *pro rata* of dividends paid to the unsecured creditors of Paul S. Felder. The contest is in reference to the $1,000 received by the bank out of the proceeds of sale in excess of $8,000. This $1,000 is claimed by the Felder heirs under the agreement, which is resisted by the bank. The Circuit Court decreed for the Felder heirs for the whole sum claimed, with interest from the day of sale, holding that the agreement operated as a transfer or assignment of all the interest of the bank in the judgment after credit with $8,000. The question before us is substantially covered and presented by the first exception as follows: "1st. Because his Honor erred in finding as a fact that it was the intention of both parties that the heirs at law of Ann M. Felder should take all of the judgment debt over $8,000, instead of finding that they were to take and did receive their *pro rata* dividends on the judgment in excess of $8,000 in the general distribution of the assets among the unsecured creditors."

The difficulty lies in the proper construction of the third paragraph of the agreement. It is the Court's province not to make a new contract for the parties, but to declare the meaning of the contract which the parties have made. In doing so, the Court should endeavor if possible to harmonize all parts of the agreement and give effect to the whole, rather than to utterly ignore some parts of the agreement. The contract was drawn by, or under the supervision of, the attorneys of the parties. If they found difficulty in clearly and briefly stating their meaning, it was no doubt because the scheme of settlement was unusual and involved some complexity of plan. It will scarcely admit of doubt that if the parties merely intended to provide for an assignment of the judgment to the Felder heirs after crediting it with $8,000 of the proceeds of sale, they would have said so in so many words, in which event the right of the Felder heirs to the surplus of the sale over $8,000 and the right to receive a *pro rata* from the Felder estate would all follow as

legal incidents, which the parties by their attorneys knew as
well as anybody. The parties seem careful to avoid express-
ing so simple a thing as an assignment of the judgment,
after applying thereto $8,000 of the proceeds of sale. It is
manifest from the language used that all that was intended
to be "turned over" to the Felder heirs was a *pro rata* part
of some general fund. The first clause of the third para-
graph is: "That after the sale of the Martin or Salley place
at foreclosure sale, then the difference between $8,000 and
the mortgage debt is to be turned into the general fund, and
the *pro rata* of the balance of the judgment in foreclosure is
to be turned over to the said heirs at law of Ann M. Felder."
In this clause the parties clearly intended that after the sale
something should be turned into, or, as between the parties
treated, as turned into the general fund of the estate of Paul
S. Felder. What was to be turned into such fund? The
difference between $8,000 and the mortgage debt. What
does that mean? Does it mean that $3,618.54, the differ-
ence between $8,000 and the mortgage debt of $11,618.54,
or does it mean the sum realized on the mortgage debt from
the sale in excess of $8,000, which as appears was $1,000?
We construe it as meaning that the excess over $8,000, real-
ized at the sale, should be treated by the parties as a part
of the general fund as to which the Felder heirs were to have
the right to pro rate, since it is manifest that the parties
intended that the bank should receive $8,000 from the pro-
ceeds of sale, if that much was realized, upon the mortgage
debt *as a lien*. It could not mean that the balance of the
judgment debt remaining after the sale should be turned
into the general fund, since the parties must have contem-
plated the turning of an asset into the general fund and not
a mere claim against such fund. Nor is it reasonable to
construe the language as merely meaning that the claim for
the balance due after the sale should have the right to receive
*pro rata* distribution from the general fund, as that would
be a wholly useless provision, such right being inevitable
under the law and well known to the parties. We think,

therefore, that the excess over $8,000 received from the sale was not to go to the bank *under its mortgage lien,* as that by the agreement was limited to $8,000; nor was it to go to the Felder heirs as a whole, for in every clause of the third paragraph of the agreement, the Felder heirs were only to receive a *pro rata* of the general fund; but we think the excess was intended to be treated as if a part of such general fund for pro rating. It will be noted here that we are considering only the rights of the bank and the Felder heirs, and are not dealing with the rights of other creditors, who are not concerned in this controversy.

It appears that the bank, outside of the mortgage debt, was an unsecured creditor of the Felder estate to the amount of $23,745. This will serve to explain why the parties fell upon their scheme of pro rating, why the bank was so particular in the fifth paragraph of the agreement to reserve all its rights as general creditors to participate in the general fund, and why the bank should prefer to take charge of the $1,000 in question, leaving it to the Felder heirs to assert their legal rights under the agreement. If the after conduct of the parties is to aid in showing what they meant by the contract, the receipt of the $1,000 by the bank is more consistent with an agreement to pro rate it with the Felder heirs than the permission by the Felder heirs for the bank to receive it is consistent with the view that it belonged to the Felder heirs by assignment. If the Felder heirs were assignees of the $1,000, why did not they—or their vigilant attorney—take steps to receive it from the disbursing officer?

Having thus determined what was to be pro rated, the amount that should go to the Felder heirs of the $1,000 is easily ascertained from the agreement, which provides, in the second clause of the third paragraph, "that the heirs at law are to get the *pro rata portion* which the Bank of Charleston, N. B. A., would have received on the balance of the judgment in foreclosure in excess of the valuation fixed herein, $8,000, whether the property sold for $8,000, or whether it sold for more than $8,000, and the excess is

turned into or treated as a part of the general fund, or whether it sold for less than $8,000, in which last case the bank would be pro rated as to the difference between the price less and the $8,000." This is made clear by the third clause, which provides, "that if the Martin or Salley place sells for more or less than the sum of $8,000, the intent of this proposition is that the heirs at law of Mrs. Ann M. Felder are to have the benefit of the *pro rata dividends* which the estate of Col. Paul S. Felder pays on the dollar to the unsecured creditors on the difference between $8,000 and the full mortgage debt due this bank just as if said place sold for $8,000." It appears that the *pro rata* of dividends which the estate paid to unsecured creditors was 13 1-15 per cent. As the Felder heirs were entitled to receive from the bank an amount equal to 13 1-15 per cent. of $3,816.54, and have only received that per cent. on $2,816.54, they are still entitled to receive that per cent. of the $1,000 in the hands of the bank, which for this purpose should be treated as funds subject to be pro rated under the agreement. Thus the amount due the Felder heirs, respondents, is $130.66, with interest from, say, the 21st day of December, 1899, when the other dividends were paid.

This conclusion renders it unnecessary to consider the remaining exceptions.

The judgment of the Circuit Court is modified, so that the judgment shall stand for only the sum of $130.66, with interest from December 21, 1899.

MR. JUSTICE GARY, *dissenting*. As I do not concur in the opinion of Mr. Justice Jones, I will state briefly the reasons for my dissent. The reasons set forth by his Honor, Judge Buchanan, in his decree, which will be incorporated in the report of the case, sustain his conclusion. Although the agreement between the bank and the Felder heirs, which is set out in the leading opinion, is inartistically drawn, and its provisions are inconsistent, it nevertheless plainly appears it was the intention of the parties that the

bank should only receive $8,000 of the proceeds arising from the sale of the mortgaged property. It must be remembered that the other creditors were not entitled, by law, to any portion of the amount for which the property was sold in excess of the $8,000, as it did not bring enough to satisfy the amount adjudged to be due on the mortgage. The controversy is solely between the bank and the heirs. It is true, there are expressions in the agreement tending to show that the fund in excess of the $8,000 was to be turned into the general fund and distributed among the creditors, and that the heirs were to receive the *pro rata* share which the bank would have received on the balance due upon its judgment in foreclosure, but they are inconsistent with other expressions in the agreement. If such was the intention of the parties, then why did not the bank turn the excess into the general fund? The failure to do so shows that the bank did not place such construction on the agreement, for if it did, it was guilty of a violation of duty.

In the case of *Williamson* v. *Association,* 54 S. C., 582, the Court says: "It is a well settled principle that when the construction to be given a contract is rendered doubtful by the language thereof, the interpretation of the contract by the parties themselves is entitled to great weight"—citing *Chicago* v. *Sheldon,* 9 Wall., 50; *R. R. Co.* v. *Trimble,* 10 Wall, 367; *Steinbach* v. *Stewart,* 11 Wall, 566; *Lowber* v. *Bangs,* 2 Wall, 728. Furthermore, if such construction is to be placed on the agreement, it would not show that the bank is entitled to more than the $8,000.

But we do not think either of the parties to the agreement intended to create a trust fund for the payment of the unsecured creditors. Such a provision might have destroyed entirely the rights of the heirs, without any benefit to the bank; for, suppose the mortgaged property had been sold for the exact amount adjudged to be due the bank, there would not have remained a balance upon which the heirs could have received a single cent as their *pro rata* share in the distribution of the excess of $8,000. Or suppose the

mortgaged property had been sold for enough, not only to satisfy the amount adjudged to be due under the mortgage, but to pay the unsecured creditors in full, they still would not have received a distributive share. The heirs certainly did not intend to enter into an agreement by which the larger the sum for which the property should be sold, the more effectually their rights might be destroyed—an agreement by which their distributive share might be *diminished* in proportion to the *increase* in the price of the property. It seems to me that the heirs have the equity on their side, and that the construction placed upon the agreement by the majority of the Court enables the bank to retain possession of a larger sum than was contemplated.

There is another reason why I cannot concur in the opinion of Mr. Justice Jones: If the heirs are to get the *pro rata* portion which the bank would have received on the balance of the judgment in foreclosure in excess of the valuation fixed therein, to wit: $8,000, the dividend would be declared, not on the difference between $8,000 and the amount adjudged to be due, but on the balance remaining after crediting the judgment in foreclosure with the amount for which the property was sold. *Wheat* v. *Dingle,* 32 S. C., 473; *Ragsdale* v. *Bank,* 45 S. C., 575.

For the foregoing reasons I dissent.